# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 16-1232V
Filed: December 4, 2024

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *
JEFFREY D. MUSUMECI,                   *
                                       *
            Petitioner,                *
v.                                     *
                                       *
SECRETARY OF HEALTH                    *
AND HUMAN SERVICES,                    *
                                       *
            Respondent.                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Patricia Finn, Esq.,* Patricia Finn, P.C., Pearl River, NY, for petitioner.
*Michael Bliley, Esq.,* U.S. Dept. of Justice, Washington, DC, for respondent.

## RULING ON ONSET[1]

**Roth**, Special Master:

On September 30, 2016, Jeffrey Musumeci ("Mr. Musumeci" or "petitioner") timely filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] ("Vaccine Act" or "Program"). Petitioner alleges that he received an influenza ("flu") vaccine on October 4, 2013 and, as a result of this vaccine, suffers from paratrigeminal

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned finds that the identified material fits within this definition, such material will be redacted from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

oculosympathetic ("Raeder's") syndrome,[3] Horner's syndrome,[4] and hemicrania continua.[5] Amended Petition at 1-3, ECF No. 13.

An onset hearing was held on November 10, 2021. Additional discovery was required thereafter. For the reasons set forth below, I find that the onset of petitioner's symptoms associated with his ultimate diagnosis of Horner's syndrome and chronic migraines which include severe right eye pain, right eye lid drooping, severe right-sided head pain, eye redness, and tearing began on October 23, 2013 with his first complaint of right sided facial pain as more specifically detailed below.

## I.    Factual History

### A.  Procedural Background

Petitioner filed his petition *pro se* on September 30, 2016. ECF No. 1. Attorney Patricia Finn substituted in as counsel on November 15, 2016. ECF Nos. 5-6. On April 3, 2017, petitioner filed a motion to strike the original petition and accompanying exhibits, then filed an amended petition and supporting evidence. Petitioner's Exhibits ("Pet. Ex.") 1-4, ECF Nos. 12-13.

In status reports filed on June 12 and August 7, 2017, respondent confirmed the sufficiency of the medical records and advised that he was not amenable to settlement. ECF Nos. 17-18. In his Rule 4(c) Report filed on September 11, 2017, respondent argued that petitioner had failed to offer a medical theory causally connecting the vaccination with his injury. Respondent further argued that petitioner had not addressed and/or ruled out his upper respiratory infection as a possible cause of his injury. ECF No. 19.

On that same day, petitioner was ordered to file an expert report. Following several motions for extension of time and motions to strike, all of which were granted, petitioner filed a report from one of his treating physicians, Dr. Forman, along with supporting literature. Pet. Ex. 5-9, ECF Nos. 20-26, 28-38.

Following a status conference held on May 23, 2018, petitioner was ordered to file a supplemental report from Dr. Forman that complied with the requirements of *Althen* and addressed petitioner's upper respiratory infection as an alternative cause of his injury. ECF No. 39. Petitioner filed the supplemental report on July 18, 2018. Pet. Ex. 10, ECF No. 40.

---

[3] Raeder's syndrome is defined as "paroxysmal neuralgic pain on one side of the face associated with blockage of sympathetic nerve impulses." *Raeder's syndrome*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1815 (33rd ed. 2020) [hereinafter DORLAND'S].

[4] Horner's syndrome is defined as "sinking in of the eyeball, ptosis of the upper eyelid, slight elevation of the lower lid, constriction of the pupil, narrowing of the palpebral fissure, and anhidrosis and flushing of the affected side of the face; caused by a brain stem lesion on the ipsilateral side that interrupts sympathetic nerve fibers." *Horner's syndrome*, DORLAND'S at 1803.

[5] Hemicrania continua is defined as a "continual, generally mild to moderate, one-sided headache that responds to indomethacin, with periodic exacerbations accompanied by conjunctival injection, lacrimation, nasal congestion, rhinorrhea, ptosis, or eyelid edema." *Hemicrania continua*, DORLAND'S at 826.

Respondent filed a Motion for Summary Judgment on August 31, 2018. ECF No. 41. Petitioner responded by cross moving for summary judgment and filing a amended expert report from Dr. Forman on September 13, 2018.[6] Pet. Ex. 11, ECF No. 42. Respondent replied to the cross motion on October 11, 2018. ECF No. 43.

The filings raised a genuine issue of material fact regarding the onset of the symptoms associated with petitioner's alleged vaccine related injuries. Both motions were therefore denied by Order dated July 31, 2019. ECF No. 45. An Onset Hearing was scheduled and took place on November 10, 2021. ECF No. 51.

Based on testimony elicited at hearing, an Order issued thereafter for certified and complete medical records from all medical providers with whom petitioner sought treatment from 2010 through the present, petitioner's health insurance billing log from 2010 to the present, and his work attendance records from 2010 through the present. ECF No. 57.

Beginning on January 25, 2022, records were filed, extensions were requested, and filings were stricken from the record. Ultimately, the medical records, work attendance records, billing records, and insurance statements were filed. Pet. Ex. 19-32, ECF Nos. 60-77. The record for purposes of ruling on onset was officially closed on July 20, 2022. ECF No. 80.

This matter is now ripe for ruling on onset of the alleged injuries.

**B. Medical History**

**1. Pre-Vaccination Medical History**

Petitioner was born in March 1963. Pet. Ex. 1 at 1.[7] His medical history includes but is not limited to diabetes mellitus type II ("diabetes"), hypertension, sleep apnea, arthritis/osteoarthritis in his hip, and low back pain, sciatica (L-S radiculopathy), and tingling from his buttock to his knee. *Id*. at 6-7.

On October 4, 2013 at approximately 3:00pm, petitioner presented to Dr. Doti, his primary care physician ("PCP"), at Crystal Run Healthcare for a physical and diabetes management. He was not checking his glucose levels. He had a recent ER visit (June 25, 2013) for "vasovagal syncope…Treated an (sic) released. No issues since." Pet. Ex. 1 at 9-12, 15; *see also* Pet. Ex. 24 at 3. The assessment on that day was diabetes and hypertension. Laboratory testing was ordered. *Id*. at 17. Petitioner filled out a consent form confirming that he was healthy and received the allegedly causal flu vaccine at this visit. *Id*. at 21.

**2. Post-Vaccination Medical History[8]**

---

[6] Dr. Forman's amended expert report is substantively the same as his supplemental report but contains a statement that petitioner's vaccine "more likely than not" caused his injury, a phrase not used in the prior report. Pet. Ex. 11 at 2.

[7] Multiple portions of this record are "blacked out" without explanation. *See generally* Pet. Ex. 1.

[8] Because this Ruling focuses on the onset of petitioner's alleged injuries from the October 4, 2013 influenza vaccine, petitioner's medical history will be limited to those injuries.

On October 21, 2013 at 8:13am, a phone call from petitioner's wife, Mrs. Musumeci, to the PCP was documented as, "please call home # before 10 am, pt has cough with sinus infection and wants to know what to do. thanks." Pet. Ex. 1 at 23. At 9:19am, Dr. Doti documented, "OK Z-pak and needs FU if not resolved."[9] A prescription was submitted electronically at 11:15am and a message left at the home number at the same time.[10] *Id.*

Two days later, on October 23, 2013, petitioner presented to Dr. Doti's office and saw Dr. Bell for "cough, sinus pain." Dr. Bell noted a 50-year-old diabetic male who presented for "re-evaluation after being seen last week for a URI. Patient was given a Zpack but reports that the cough continues. He also reports R sided face pain and ear fullness…Did not take BP medication today due to feeling poorly."[11] Pet. Ex. 1 at 26. Review of Systems was positive for "Pain in/around ear, sinus pressure" and "cough" and negative for chills, fatigue, fever, malaise, chest pain, headache, joint pain, and joint swelling. *Id.* at 27. Examination revealed protuberant conjunctiva[12] in his right eye and moderate effusion in his right ear possibly secondary to sinus congestion. The assessment was otitis media.[13] *Id.* at 28. Afrin,[14] Augmentin,[15] and guaifenesin[16] were prescribed. *Id.* at 29.

Five days later, on October 28, 2013, petitioner presented to Urgent Care at Crystal Run Healthcare for 8/10 headache pain and cold symptoms. Pet. Ex. 1 at 31. Review of Systems was positive for fatigue and negative for chills/rigors or fever, vertigo, diplopia, photophobia, vision loss, nausea, vomiting, and neck stiffness. *Id.* at 32. "Patient reports pain of 8/10 located in r eye and r forehead and describes the pain as aching, sharp, tender. Pain has been present for 6 Days. Patient experiences relief by Nothing. Pain becomes worse with nothing."[17] *Id.* The examination was unremarkable. *Id.* at 33. A chest x-ray revealed no active pulmonary disease. *Id.* at 58. The assessment was headache above the eye region and reactive airway disease. Oxygen and an injection of Toradol were given. *Id.* at 34. He felt better and was prescribed an albuterol inhaler and prednisone taper for reactive airway disease. *Id.*

---

[9] Azithromycin is defined as "an azalide antibiotic… used in the treatment of mild to moderate infections caused by susceptible organisms." *Azithromycin*, DORLAND'S at 184.

[10] There is no record of any telephone call between petitioner, his wife, and Dr. Doti following what appears to be a transcription of Mrs. Musumeci's phone message.

[11] There was no medical record or insurance record showing a visit the week prior—only the record of the phone call on October 21, 2013 at which time Dr. Doti prescribed a Z-Pack.

[12] Conjunctiva is defined as "the delicate membrane that lines the eyelids and covers the exposed surface of the sclera." *Conjunctiva*, DORLAND'S at 400. Protuberance is defined as "a projecting part, or prominence; an apophysis, process, or swelling." *Protuberance*, DORLAND'S at 1515.

[13] Otitis media is defined as "inflammation of the middle ear." *Otitis media*, DORLAND'S at 1331-32.

[14] Afrin is a trademark for a derivative of oxymetazoline hydrochloride, which is defined as "an adrenergic, used topically as a vasoconstrictor to reduce swelling and congestion of the nasal mucosa and to relieve redness associated with minor irritations of the eye." *Oxymetazoline hydrochloride*, DORLAND'S at 1338.

[15] Augmentin is a trademark for combination preparations of amoxicillin and clavulanate potassium. *Augmentin*, DORLAND'S at 176.

[16] Guaifenesin is defined as "an expectorant believed to act by reducing sputum viscosity, administered orally." *Guaifenesin*, DORLAND'S at 800.

[17] This report places onset of his right-sided face pain as October 22/23, 2013, 18 days after his flu vaccine, but does not mention when his cold symptoms started. *See id.* at 21, 31.

Petitioner returned to Dr. Doti on October 30, 2013. Dr. Doti wrote, "right sided sinus issues[.] He is on steroids and getting some relief. No nasal discharge but was very congested in [head] more on the right. No fevers. Right eye remains puffy but vision is fine. Right temple pins and needles noted." Pet. Ex. 1 at 36. Review of Systems was now positive for fatigue, sinus pressure, eye pain, and cough and negative for chills, fever, hearing loss, nasal drainage, eye discharge, dyspnea, and wheezing. *Id*. at 37. On examination, he had puffiness of the right eye with "swollen right maxillary and tender maxillary" over his right sinuses. The assessment was acute sinusitis. *Id*. at 37-38. He was to complete the steroid and Augmentin and watch for possible shingles rash. He was also to follow up if symptoms did not resolve. *Id*. at 38.

On November 4, 2013, petitioner presented to his family eye doctor, Dr. Liebergall, reporting a history documented as "OD swollen pain around whole outer orbit into skull . . . 3 wks, saw prim phys . . . 3 different antibiotics [diagnosed] ear + sinus infections injection Tordal (sic), no relief, BDR, sugar slight elevated."[18] Pet. Ex. 1 at 40. On examination "Slight ptosis OD; no lesions pupils" was noted. *Id*. The impression was, "1) slight ptosis; no obvious (illegible) 2) R temporal pain ? 2d sinus, trigeminal neuralgia ? [Herpes Zoster Ophthalmicus] but no rash".[19, 20] *Id*. at 40.

Petitioner returned to Dr. Doti on November 8, 2013 complaining of PND (paroxysmal nocturnal dyspnea), productive cough, and continued pain mostly behind his right eye and top of the right side of his head. He had seen his ophthalmologist with no issues found. His right eye lid "still lags". He reported feeling as if his hair was being pulled on the right side of his head. Pet. Ex. 1 at 42. MRI of the brain and brain stem without contrast was ordered. *Id*. Review of Systems was positive for nasal drainage, eye pain, and cough, and negative for chills, fatigue, fever, sinus pressure, chest pain, rash, skin lesion, joint pain, muscle weakness, and neck pain. *Id*. at 43. Examination revealed "upper puffiness" and "PERRLA" of the right eyelid. *Id*. at 44. Dr. Doti's assessment was trigeminal neuralgia. Neurology consult was recommended, and Neurontin was prescribed. *Id*. MRI performed on November 11, 2013 showed mild white matter signal changes compatible with chronic small vessel ischemic disease.[21] *Id*. at 56.

Petitioner presented to Dr. Salomon, a neurologist, on November 13, 2013 for right facial pain across the right side of his forehead and "frontal region". Pet. Ex. 1 at 46-49. The area was sensitive to touch, he could not wash his face or hair without pain, and his right eye would become red. He denied excessive tearing or a runny nose. *Id*. at 46. Petitioner reported onset of pain five weeks ago with no precipitating event. He reported receiving a flu shot five days prior. He was diagnosed with a right ear infection and sinusitis by his PCP. He took the antibiotics prescribed without improvement. He also was prescribed indomethacin without improvement but did not take it consistently. *Id*. Review of Systems was positive for eye pain and headache and negative for all other symptoms. *Id*. at 47. Petitioner rated his pain as 4/10. *Id*. Dr. Salomon's assessment was

---

[18] This report places onset of petitioner's head pain around October 14, 2013, nine days after his flu vaccine. *See id*. at 21, 40.

[19] Trigeminal neuralgia is defined as "severe, episodic pain in the area supplied by the trigeminal nerve, often precipitated by stimulation of well-defined trigger points." *Trigeminal neuralgia*, DORLAND'S at 1244.

[20] Dr. Liebergall's office advised it had no records for petitioner who has not been seen since 2013. Pet. Ex. 22. The office changed to electronic records in 2014. Dr. Liebergall's record was contained in the Crystal Run records. *See* Pet. Ex. 1.

[21] Ischemia is a "deficiency of blood in a part" of the body. *Ischemia*, DORLAND'S at 949.

trigeminal neuralgia and right eye ptosis.[22] *Id*. at 48. His differential included "Right ptosis, right miosis", "? Horners (sic) with V1 distribution pain," "? Trigeminal neuralgia, ?Possible cavernous sinus involvement." *Id*.

Petitioner underwent magnetic resonance angiography ("MRA")[23] of his head on November 15, 2013. The results were negative/normal. Pet. Ex. 1 at 55. A brain MRI performed on November 22, 2013 showed no cavernous sinus masses. *Id*. at 53. A CT angiogram[24] performed on November 27, 2013 showed no segmental stenosis or occlusion. *Id*. at 51.

Petitioner returned to Dr. Salomon on November 27, 2013. His history included right facial pain beginning six weeks ago with no precipitating event and flu shot five days prior.[25] There was no change since his last visit, and he had been compliant with medications without relief. He awoke that morning with a sore throat that felt like there was a ball in his throat. Pet. Ex. 1 at 61. Review of Systems was positive for eye pain, cough, and headache, and negative for all else. *Id*. at 62. All objective testing was negative. Dr. Salomon's assessment on that date was ptosis and right facial pain. *Id*. at 63. He referred petitioner to Dr. Forman, a neuro-ophthalmologist, for evaluation of right upper lid ptosis.[26]

On December 5, 2013 petitioner presented to Dr. Forman. The office record reads:

---

[22] Ptosis is defined as a "drooping of the upper eyelid" *Ptosis*, DORLAND'S at 1528.

[23] MRA is defined as a "form of magnetic resonance imaging used to study blood vessels and blood flow, used for detection of abnormalities in the vessels of the head and neck." *Magnetic resonance angiography*, DORLAND'S at 84.

[24] CT angiography is defined as "a minimally invasive form of angiography in which contrast material is injected intravenously through a small needle or cannula and precise, detailed images of the vascular system are produced by computed tomography." *Computed tomography angiography*, DORLAND'S at 83.

[25] Petitioner's flu vaccine was eight weeks prior to this visit, not six. Pet. Ex. 1 at 21, 61. Six weeks prior to this visit was October 16, 2013, twelve days after he received the flu vaccine. *Id.* at 21.

[26] Dr. Forman's records are contained in the Crystal Run record, his office advised that there are no medical records in their office for petitioner. Pet. Ex. 23.

Pet. Ex. 1 at 68. The above is a portion of the December 5, 2013 record handwritten by Dr. Forman. The second line of the history of present illness shows Dr. Forman's notes regarding the onset of petitioner's symptoms.

In an undated letter to Dr. Salomon, Dr. Forman wrote that petitioner and his wife presented on December 5, 2013 for evaluation of right upper lid ptosis. Pet. Ex. 1 at 66. Petitioner provided a history that included a flu shot six weeks ago after which he developed "a severe cough, right sided scalp pain, lid swelling, severe orbital and retro-orbital pain with ocular tenderness. The right upper lid then drooped and pain in the right scalp also persisted." *Id*. The tests performed showed normal vessels and maculae, unilateral ptosis, right upper lid ptosis, right lower lid upside down ptosis, and his right lower lid higher than left lower lid. "Installation of two drops of aproclonidine resulted (45 min later) in 'reversal of anisocoria', i.e., the larger pupil was now on the right, indicative of denervation super sensitivity and diagnostic of Horner's syndrome." *Id*. Ocular alignment was normal. He had decreased sensation in the first two divisions of the trigeminal nerve on the right. *Id*. Dr. Forman's impression was "likely paratrigeminal oculosympathetic syndrome . . . (formerly known as Raeder's paratrigeminal neuralgia[)]". *Id*. at 67. He also listed other similar syndromes, including hemicrania continua, SUNCT syndrome[27], and cluster headaches. He wrote that petitioner did not respond to indomethacin which ruled out hemicrania continua. Dr. Forman prescribed a trial of prednisone with taper but did not "have a sense of whether or not it will work." Dr. Forman noted that petitioner had decreased sensation in the distribution for the first two divisions of the trigeminal nerve but normal visual function. He told petitioner that his Horner's would not improve but the ptosis would not worsen. *Id*.

Upon referral from Dr. Forman, petitioner presented to Dr. Napchan at the Middletown Medical P.C. Headache Clinic six weeks later on January 29, 2014. Pet. Ex. 1 at 74. Petitioner

---

[27] SUNCT refers to "short-lasting unilateral neuralgiform headache attacks with conjunctival injection and tearing." *SUNCT*, DORLAND'S at 1773.

provided a history that five days after an October 2013 flu shot, he had some nasal congestion, coughing, wheezing, generalized malaise, and difficulty sleeping. He was prescribed a Z-PAK and Levaquin. "Three weeks later he reports that he noticed his right eye being droopy, right retroorbital pain and pain in the right frontal and temporal regions." *Id*. He has had pain ever since with eye redness but no tearing, right nasal congestion, ipsilateral photophobia, and light and sometimes heat sensitivity. All testing was normal. Dr. Forman diagnosed him with Horner's syndrome without anhidrosis[28], although he has V1 and V2 numbness and possibility of Raeder's paratrigeminal neuralgia. He tried but had no relief from lamotrigine[29] for five days, carbamazepine[30] for five days, and indomethacin for five days. He has been on prednisone for two and half weeks with no relief. *Id*. Dr. Napchan's assessment was ipsilateral[31] headache with autonomic features, right V2 numbness, and right occipital nerve tenderness. *Id*. at 76. His differential diagnosis included primary and secondary headache disorders. He noted that petitioner never took a full trial of indomethacin, so a "small trial" was to start. *Id*. A right greater occipital nerve block successfully reduced petitioner's pain and photophobia,[32] however, his other autonomic features did not improve. *Id*. Petitioner was prescribed Topamax[33] along with indomethacin. *Id*.

The remainder of petitioner's medical records detail the treatment he has undergone with Dr. Napchan for his final diagnoses of chronic migraine headaches, Horner's syndrome, right sided pain associated with right sided ptosis, eye tearing, and redness; work up has not been diagnostic. He also suffers from lower back pain and underwent lumbar fusion (including L5-S1 decompression, L5-S1 bilateral interbody fusion, L5-S1 bilateral facet fusion and L5-S1 bilateral inside out cortical screw fixation). *See generally* Pet. Ex. 1; Pet. Ex. 20; Pet. Ex. 21A; Pet. Ex. 21B.

## C. Affidavits and Testimony

### 1. Petitioner's Affidavits

Petitioner submitted two affidavits prior to the hearing and one after the hearing. Pet. Ex. 12; Pet. Ex. 15; Pet. Ex. 30.

Petitioner affirmed receipt of the influenza vaccine on October 4, 2013 during a visit with Dr. Doti. Pet. Ex. 12 at 1. Five days later, he developed a "severe cough with a deep congestion, dizziness, pain in [his] right eye, pain in the right side of [his] head-scalp area, right eye lid

---

[28] Anhidrosis is an "absence or severe deficiency of sweating, usually due to absence or paralysis of the sweat glands or to obstruction of the sweat ducts." *Anhidrosis*, DORLAND'S at 90.

[29] Lamotrigine is an "anticonvulsant used in the treatment of partial seizures in adult patients." *Lamotrigine*, DORLAND'S at 990.

[30] Carbamazepine is "an anticonvulsant and antineuralgic, used in the treatment of pain associated with trigeminal neuralgia and in epilepsy manifested by tonic-clonic and partial seizures carbamazepine." *Carbamazepine*, DORLAND'S at 283.

[31] "Ipsi-" means "same," so "ipsilateral" means "same side." *Ipsi-*, DORLAND'S at 947.

[32] Photophobia is defined as the "abnormal visual intolerance of light." *Photophobia*, DORLAND'S at 1419.

[33] Topamax is a "trademark for preparation of topiramate," which is a "substituted monosaccharide used as an anticonvulsant in the treatment of partial seizures." *Topamax*, DORLAND'S at 1910; *Topiramate*, DORLAND'S at 1910.

swelling, right eye lid drooping, pain in [his] jaw, and an overall feeling of inability to function normally." *Id*. at 2; Pet. Ex. 15 at 1-2.

Petitioner affirmed that all symptoms worsened and on October 21, 2013, his wife called the doctor who prescribed an antibiotic for sinus infection. He felt worse despite the antibiotic and his wife took him to Dr. Bell on October 23, 2013. Pet. Ex. 15 at 2. Dr. Bell diagnosed him with a right-sided ear infection, right eye fullness, and a cough. He was prescribed a stronger antibiotic and cough syrup. Blood testing was ordered. *Id*.

Petitioner affirmed that he continues to suffer from right sided head pain, eye lid drooping, jaw pain, lack of energy, tiring quickly, stammering, slurring, delayed speech with difficulty forming of sentences, difficulty with simple math, irritation, and exhaustion with no relief from constant pain. Pet. Ex. 12 at 2. He receives "31-35 Botox injections in [his] head, neck and shoulders every 12 weeks." *Id*. He is prescribed Nurtec to "bridge" the 9-12 weeks between Botox injections. *Id*. The Botox injections cause significant bleeding on the right side of his head, particularly over his right eye and temple. *Id*.

During the hearing, there was a discussion about how the medical records filed in this case were secured because the records were filed as one exhibit, in chronological order, and included records of doctors from various unrelated medical facilities. Petitioner submitted an affidavit affirming that his prior attorney secured his medical records from Crystal Run Health Care and that those records included his visits with Dr. Forman and Dr. Salomon.[34] Pet. Ex. 30.

### 2. Petitioner's Testimony

Petitioner stated he reviewed all the records prior to hearing. Tr. 8.

He recalled going to Dr. Doti on October 4, 2013 for his yearly physical but had no medical issues at the time. Tr. 8. He received the flu vaccine which he had never received before. Tr. 8-9.

He was fine until the fourth day after the flu vaccine, October 8, 2013, when he had a cough, chills, pains in his chest, jaw, eye, top of his head like "someone pulling your hair," no energy, and difficulty breathing that progressed throughout that day and night. Tr. 10-12. He "laid in bed for almost two weeks afterwards" but could not recall taking any medications for his symptoms. He never felt like this before and had never had the flu or an upper respiratory infection before. Tr. 11-12.

Petitioner did not recall who called Dr. Doti on October 21, 2013, only that he was prescribed an antibiotic for a respiratory infection. Tr. 12-13. He could not explain why he waited 12 days to reach out to the doctor with all the symptoms he had. Tr. 14.

---

[34] Both Dr. Forman's and Dr. Salomon's offices advised that they have no records for petitioner other than what was provided to Crystal Run.

Petitioner stated that he saw Dr. Bell on October 23, 2013, was diagnosed with a sinus infection, and prescribed a stronger antibiotic. Tr. 15.[35] The medication did nothing, his pain got worse over the following week, and his right eye swelled and closed. Tr. 16-17. Petitioner stated that he saw various doctors at Crystal Run and became so ill one day he went to urgent care and was given an IV and another prescription. Tr. 17. He saw six doctors over a four-week period. No one diagnosed him with the flu and only Dr. Bell diagnosed him with a sinus infection. Tr. 18.

Petitioner read the October 28, 2013 medical record: "Patient reports pain of 8/10 located in right eye and right forehead and describes the pain as aching, sharp and tender. Pain has been present for 6 days…". Tr. 20; Pet. Ex. 1 at 32. Petitioner stated the record of his complaints was correct but "present for 6 days" was wrong because the pain began four days after the flu vaccine. Tr. 21-22. He could not explain why that portion of the record was wrong, but he "was not the person who put that in there." Tr. 22.

Petitioner stated he realized in early November that there was a "common thread" between the vaccine and his symptoms when Dr. Forman explained it to him[36]; before that, no one attributed his symptoms to the flu vaccine. Tr. 23, 25, 29. Petitioner stated he did not mention the flu vaccine to Dr. Forman; rather, Dr. Forman asked him if he had received the flu vaccine because he had seen "similar things" happen after the flu shot. Tr. 28-29. He then said his first visit with Dr. Forman[37] was on December 5, 2013. Tr. 26-27; Pet. Ex. 1 at 69-71. He had no ocular problems prior to this situation, only LASIK surgery in 2003. Tr. 28.

Petitioner stated that he currently receives Botox injections every 12 weeks and uses Nurtec when the Botox wears off and his pain becomes agonizing. Tr. 30, 42. He has speech, math, typing, and focus problems, as well as headaches.[38] Tr. 30. He also still has the hair pulling sensation and eye drooping, which are permanent. Tr. 30.

On cross examination, petitioner recalled having pre-onset type 2 diabetes when he saw Dr. Doti on October 4, 2013. Tr. 32-33. He also agreed he had hypertension but did not recall if he had sleep apnea at the time. Tr. 33.

Petitioner confirmed he was fine after the flu vaccine and went to work but his symptoms started four days later on October 8, 2013, the anniversary of his father's death. Tr. 34-35. At first, he stated the symptoms started in the afternoon of October 8th while he was at work.[39] Tr. 36-37. He then stated his first symptom was right eye drooping and closing which he saw in the mirror that morning and achiness that was present all day. Tr. 37-38, 40. Then "thing started to happen." Tr. 37-38, 40. The pain in his head started gradually in the afternoon starting behind his eye and radiating up and down his jaw. Tr. 39. Then his eye started closing and then he had pain behind the eye that started

---

[35] During his testimony, petitioner was asked if he was reading from something because he kept looking down but denied that he was. Tr. 15-16.

[36] The records show that petitioner did not see Dr. Forman until December 5, 2013. Pet. Ex. 1 at 68.

[37] The record reflect counsel asking about "Dr. McCusker", but petitioner never saw a Dr. McCusker; counsel clarified that she meant Dr. Forman. Tr. 28.

[38] During the hearing, petitioner testified without any apparent speech difficulties, difficulty forming sentences, or problems focusing.

[39] His work records show that October 8, 2013 was a Tuesday and he worked from 8:13am to 8:19pm for a total of 12.10 hours. Pet. Ex. 19 at 181.

later in the day. Tr. 40-41. He could not remember if his wife, kids, or anyone at work noticed his eye that day or said anything about it. Tr. 39, 41-42.

Petitioner did not recall when the cough started, perhaps overnight between October 8 and October 9. Tr. 42. Then on the fourth or fifth day, he developed congestion that felt like there was something heavy sitting on his chest making it difficult to breathe. Tr. 43. His dizziness began between day four and five which so disabled him that he was unable to leave the house for almost two weeks. Tr. 43-44. His right eye also began to water on day four or five and he recalled that his wife commented on it. Tr. 44. He did not remember what day of the week his symptoms began, how long he worked that day, or if he had dinner with his family. Tr. 45. He could not agree that he had flu like symptoms because he never had the flu before. Tr. 44. He considered the symptoms unusual but did not call the doctor or take any medications.[40] Tr. 46.

The next day, October 9, 2013, he had aches and pains, lack of energy, eye drooping, and pain in his forehead into his jaw. He had congestion and a cough but the severity level "hadn't gotten nearly as bad as it was going to get". Tr. 46-47. The pain in his right eye and head became worse on October 9. Tr. 47. His right eye appeared swollen, but was not swollen, it was just closed. Tr. 48. He stated he called in sick to work on October 9 but did not recall taking any medications.[41] Tr. 48.

Petitioner agreed he would be as accurate as he could when reporting his symptoms to his doctor. Tr. 48-49, 52. He further agreed that he reviewed his medical records, and they accurately reflected his medical events and care in the months of October, November, and December of 2013. Tr. 52.

Petitioner agreed that his first contact with a medical professional about his symptoms was on October 21, 2013. Tr. 52-53. He did not recall who contacted the doctor or the details of the telephone conversation on that date. Tr. 53-54. He now stated he was uncertain but believed he did not work during that 13-day period between the receipt of his flu vaccine and October 21 because his symptoms were constant.[42] Tr. 52-53. Respondent's counsel noted that the October 21 telephone call was made by petitioner's wife who reported a "cough with sinus infection." He agreed he had a "severe" cough since October 8 or 9 but did not know she reported a sinus infection. Tr. 54-55; Pet. Ex. 1 at 23. He agreed that no complaints of dizziness, right eye pain, right head scalp pain, right eyelid swelling, right eyelid drooping, jaw pain, flu-like symptoms, weakness, or lethargy for that 13 day period between October 8 and October 21 were contained in the record. Tr. 56, 58.[43] He agreed Dr. Doti prescribed a Z-Pak but did not ask to see him in the office on October 21. Tr. 58-59.

---

[40] Petitioner's work records show that he worked full time from October 8 through October 20 when he left work early and called in sick over the next two days. He returned to work full time on October 24, 2013. Pet. Ex. 19 at 181-84.

[41] It does not appear that petitioner was scheduled to work on October 9. The record documents when petitioner logs sick leave, and there was no record of his calling in sick on October 9. Pet. Ex. 19 at 181-82.

[42] See supra notes 39 and 40.

[43] Petitioner's counsel objected to the question, stating that no one knows what Mrs. Musumeci actually said and the record is hearsay. She further argued that the Federal Circuit ruled medical records are not dispositive, contemporaneous or otherwise. Tr. 56-58. The record appears to be a transcription of a phone message left by Mrs. Musumeci.

Petitioner agreed that his first medical visit following the October 4, 2013 flu vaccine was on October 23, 2013. Tr. 59. He agreed that the October 23, 2013 medical record reflected complaints of a cough and sinus pain with ear fullness and the first documented report of right sided facial pain to a medical provider. Tr. 59-61; Pet. Ex. 1 at 26. He agreed the record did not include when his symptoms began. Tr. 61. He agreed the medical record was negative for headaches but stated he had never had headaches. Tr. 61-62. He agreed the examination was positive for ear pain, sinus pressure, and cough. Tr. 61-62; Pet. Ex. 1 at 27. He agreed that his eyes were examined with protuberant conjunctiva noted. Tr. 62; Pet. Ex. 1 at 28. He agreed the medical record does not contain eye drooping or use of the word "ptosis." Tr. 62-63. Petitioner agreed he was diagnosed with otitis media on that day and prescribed Augmentin and cough medicine. Tr. 63-64.

Petitioner was asked about his urgent care visit on October 28, 2013, twenty-four days after the vaccination. He agreed the medical record documented a complaint of headache and cold symptoms but disagreed that he had a headache because he does not get headaches; It was head pain. Tr. 64-65; Pet. Ex. 1 at 31. He agreed the record documents that his pain was present for 6 days but stated that was inaccurate. Tr. 65-66; Pet. Ex. 1 at 32.

Petitioner was asked about his return visit to Dr. Doti on October 30, 2013. He agreed the record contained complaints of right-sided sinus issues and a cough. Tr. 67-68.

Petitioner was asked to read Dr. Liebergall's record for November 4, 2013. Tr. 68-69; Pet. Ex. 1 at 40. "OD swollen, pain around whole outer orbit into skull" and "3 weeks." Petitioner stated that he told Dr. Liebergall's colleague "this all began" after he received the flu vaccine; the eye droopiness began four days after the flu shot, then the pain developed a day after that, then the pain in the back of his eye developed, and then the pain in his skull presented around five days after the vaccine. Tr. 70-71. He agreed this was the first record that mentioned "slight ptosis" of his eye. Tr. 71-72; Pet. Ex. 1 at 41.

Petitioner did not recall returning to Dr. Doti on November 8, 2013 but stated the record was accurate for his symptoms that day which included shortness of breath, cough with sputum production, and pain behind the right eye and top of right side of his head which felt like his hair was being pulled. Tr. 72-73; Pet. Ex. 1 at 42.

Petitioner agreed that he saw Dr. Salomon on November 13, 2013 for evaluation of right facial pain and in follow up on November 27, 2013, but disagreed with the record that documented symptom onset 5 and 6 weeks prior, respectively. Tr. 73-76; Pet. Ex. 1 at 46, 61. He stated his cough was constant from October 8 or 9 through November 27, 2013. Tr. 77.

Petitioner agreed that he presented to Dr. Forman on December 5, 2013, 62 days after the flu vaccination for "right eyelid droop". Tr. 77; Pet. Ex. 1 at 66. He stated the record of his history of symptoms which included severe cough, right sided scalp pain, lid swelling, and severe orbital and retro-orbital pain with ocular tenderness was accurate. Tr. 78. He disagreed with the record that the onset of symptoms was 6 weeks ago (or October 24), calling it "bad math." Tr. 79-80. He stated that Dr. Forman asked him if he had received a flu vaccine. Tr. 78. He confirmed this was the only appointment he had with Dr. Forman. Tr. 80.

Petitioner confirmed seeing Dr. Napchan on January 29, 2014 four months after his receipt of the flu vaccine. He agreed with Dr. Napchan's record documenting a history of flu vaccine in October 2013, followed by nasal congestion, coughing, wheezing, generalized malaise, and difficulty sleeping five days later; given a Z-Pak and Levaquin; then three weeks later, eye became droopy with right retroorbital pain and pain in the right frontal and temporal regions; and that he had constant pain without positional or postural component. Tr. 80-81; Pet. Ex. 1 at 74. He agreed that three weeks after October 9 would be October 30. Tr. 81.

Petitioner confirmed that his two affidavits dated in November 2019 and October 2021, were accurate and complete. Tr. 82. He was asked why in his affidavits he described a five day onset and testified to a four day onset. He stated his symptoms began "four, four and a half, five days" after vaccination but he noticed symptoms on the fourth day but was not "deathly ill" until the fifth day when "things started to go downhill." Tr. 82, 85-86. He had no explanation for why his affidavit did not contain watery eyes which he testified to or flu like symptoms like his wife's affidavit.[44] Tr. 83.

On redirect, petitioner stated that "quite a few of [the records] are inaccurate" because the eye drooping began on October 8, four days after the vaccination then the pain started after that. Tr. 84.

Petitioner also stated that he told the doctors "countless times" that "it's inaccurate to describe [his pain] as a headache" because it was head pain like hair pulling. Tr. 86, 89; Pet. Ex. 1 at 31. Further, the references to his head pain only being present for 6 days was wrong. Tr. 86, 89; Pet. Ex. 1 at 32.

Petitioner stated that he told Dr. Liebergall he had stabbing pain behind his eye, skull, and forehead and could not explain why Dr. Liebergall's record did not include that. Tr. 90; Pet. Ex. 1 at 40. Dr. Liebergall's record stating that onset of symptoms was three weeks prior his visit was also wrong because it "began earlier than that." Tr. 91. However, the description of right eye lag and pain was accurate. Tr. 91; Pet. Ex. 1 at 42.

Petitioner stated that Dr. Bell's October 23, 2013 record documenting eye swelling was wrong, his eye was closed—not swollen; but people can't distinguish between droopiness and swelling. Tr. 88; Pet. Ex. 1 at 28.

Petitioner stated that his wife obtained all of his medical records. He did not know why portions were redacted but noticed that during the hearing. Tr. 92-94.

I asked petitioner how it was that he was not concerned about the serious and debilitating symptoms he was describing as having occurred five days after his flu vaccine. He stated that his symptoms were "odd," but he thought they would resolve on their own. When they got progressively worse, he sought treatment, but "[he] never said that it's because of the flu shot." Tr. 96-97.

---

[44] He denied reading his wife's affidavit when asked what he read to prepare for the hearing. Tr. 32.

Petitioner denied the possibility that five days after the flu vaccine he developed congestion, sinus pain over his eye, and coughing which then progressed to the other symptoms he described closer to October 21 and that was the reason he did not seek medical attention. Tr. 99.

Petitioner again stated that he was in bed for two weeks following the flu vaccine and onset of symptoms and could not work. Tr. 98-100. He then said he was unsure if he stayed home from work for the two weeks despite his symptoms because even after his head injury in 2003, he went back to work after only one day of rest and denied he suffered a headache after that incident. He also went back to work sooner than expected after his back surgery in 2018. Tr. 99-100. I asked him to explain how he could suffer from such serious symptoms that he had never experienced before that kept him in bed for two weeks but did not contact a medical professional. He stated that he "can't explain it." Tr. 100.

According to petitioner, all the records regarding the onset of his symptoms were wrong. Tr. 101. All the symptoms he described—hair pulling feeling, intense pain behind his eye, eye drooping—began four to five days after the receipt of the vaccination and progressed until he presented to a doctor on October 23, 2013. Tr. 102.

### 3. Mrs. Musumeci's Affidavits

Petitioner's wife Jennifer Musumeci submitted two affidavits prior to hearing and one affidavit following the hearing. Pet. Ex. 13; Pet. Ex 16; Pet. Ex. 32.

Mrs. Musumeci affirmed that petitioner received a flu vaccine on October 4, 2013 and about 4-5 days later "explained to [her] he was feeling very congested, had a cough and flu-like symptoms." Pet. Ex. 13 at 1; Pet. Ex. 16 at 1. He also complained of "severe pain on the right top side of his head, a severe pain behind his right eye, and his right eyelid was drooping, and his eye was watering." He told her it felt "like someone was pulling his hair on the top right side of his head" and he had jaw pain. *Id*. He was rendered unable to perform his usual life activities such as working, being an involved father and husband, and was "consumed with pain." Pet. Ex. 13 at 2; *see also* Pet. Ex. 16 at 1-2. They both felt his symptoms were temporary and would resolve. Pet. Ex. 16 at 2.

According to Mrs. Musumeci "[a]fter twelve days of watching [her] husband in excruciating pain, to say this was alarming was an understatement" and because his symptoms did not go away but got worse, she called the doctor on October 21, 2013. Pet. Ex. 16 at 2. His doctor called in an antibiotic "to treat what was believed to be a sinus infection." *Id*. They then went to Dr. Bell on October 23, 2013 and petitioner was diagnosed with right-sided ear infection, right eye fullness, and cough. Dr. Bell prescribed a stronger antibiotic and cough medicine and ordered testing. *Id*.

According to Mrs. Musumeci petitioner's symptoms prompted tests, hospitalizations, and medications and after all treatment failed, he saw a pain management doctor in February of 2014 who prescribed strong oral medications and a schedule of 32 Botox injections annually meant to "curb the constant pain in his eye and right, top side of his head." Pet. Ex. 13 at 2; *see also* Pet.

Ex. 16 at 2. Petitioner is still in pain management, has trouble concentrating and focusing, takes "very strong" medications with "severe side effects" and "many times…feels awful", and is irritable due to pain. Pet. Ex. 13 at 2; *see also* Pet. Ex. 16 at 2-3. He has been prescribed new medications on occasion that will help while still taking all other medications. Pet. Ex. 16 at 3.

In an affidavit filed after the hearing, Mrs. Musumeci affirmed that their initial attorney sent all of petitioner's medical records to her with instructions on how to file a claim with the Federal Court of Claims and a list of attorneys who specialize in these cases when he advised he could not accept petitioner's case. She affirmed the medical records were "in the chronological order in which they were received." Pet. Ex. 32 at 1.

### 4. Mrs. Musumeci's Testimony

Mrs. Musumeci stated all petitioner's medical records were gathered and sent to the lawyer. Tr. 106-07. She "probably" read them at some point but not recently, but they were "ingrained in [her] mind". Tr. 106-07. She then admitted to reviewing the medical records in preparation for her testimony with counsel the day before hearing but did not review petitioner's affidavits. Tr. 107-09, 124-25.

Mrs. Musumeci stated that petitioner went for his physical on October 4, 2013 and told her he received a flu vaccine when he got home. Tr. 109-10. She stated that petitioner was "okay" the night of the flu vaccine, but the next day had "sniffles," cold symptoms, a scratchy throat and was achy. Tr. 110-11, 125-26, 127. She remembers the dates because petitioner never gets sick and never had a flu vaccine before so they "were super sensitive into thinking…let's watch for anything…". Tr. 126, 130, 131, 132. Her thinking was that his symptoms were from the vaccine, a cold, coincidence, or allergies but when the eye pain started, she knew it was not a cold. Tr. 130. When advised that October 4, 2013 was a Friday, she stated petitioner would have worked on Saturday, so it was either Saturday or Sunday that the scratchy throat and cold like symptoms started but he was able to work. Tr. 127-29.

When asked why her affidavit stated the onset of his symptoms was within 4-5 days of the flu vaccine but was now saying the next day, she said because his symptoms "worsened" on the fourth day with severe pain on the right side of his head and behind his eye and that was when "we got a little alarmed." Tr. 111-13, 115, 132; Pet. Ex. 13 at 1. She then said it was "[p]robably the next week" that his symptoms worsened. Tr. 116. Then, she stated that he first complained of eye drooping, watering, and pain on October 8 in the evening and she recalled him at dinner that night holding his eye complaining of pain and feeling like his hair was being pulled from his head. Tr. 116-18, 128-29, 131, 136. After dinner, he would blink and the right eye would stay slightly closed and was teary, then the pain started. Tr. 134-35.

Mrs. Musumeci stated it was pain not a headache that petitioner complained of like someone pulling his hair "maybe the fifth or sixth day" after the vaccine. Tr. 113-14, 118-19; Pet. Ex. 13 at 1. He was miserable, irritable, not improving, stayed home from work, was unable to help around the house or tend to their yard like usual, and she had to cut her hours at work to stay home and make sure he was okay. Tr. 114.

Mrs. Musumeci stated that they did not call the doctor because they thought the symptoms would go away. Tr. 112, 115. When she called the doctor on October 21, 2013, she told them petitioner had cold symptoms, pain behind his eye, and recently had a flu shot. She was told it was probably a sinus infection. Tr. 115-17, 141-42, 144-45. She insisted he be seen because of the pain in his eye but was told a sinus infection could cause eye pain. Tr. 144-45. She did not recall if she mentioned his eye drooping. Tr. 145-46. She was told an antibiotic would be called in, but they could not fit him into their schedule that day to be seen. Tr. 115-16, 141-42, 144-45. Mrs. Musumeci agreed she would be accurate in her description of petitioner's symptoms when she called the doctor's office. Tr. 144-45. She agreed she reported cough and sinus infection because that's what she thought it was, but his cough was only sporadic at the time. Tr. 146-47; Pet. Ex. 1 at 23. Two days later, when he was not better after taking the antibiotic, they went to see the doctor. Tr. 142.

They both attended petitioner's medical appointments. Tr. 118-19. She thought all the symptoms were related because the eye drooping was on the same side as the head pain. Tr. 119. No doctor diagnosed petitioner with the flu. Tr. 119-20. Dr. Bell diagnosed him with an upper respiratory infection and prescribed a stronger antibiotic and cough medicine. Tr. 120.

Mrs. Musumeci stated that petitioner's condition is now controlled with several medications, but he is never out of pain. He gets Botox injections every 12 weeks and takes Nurtec when the Botox wears off between 9 and 12 weeks. Tr. 122-23.

She disagreed with the onset of eye and head pain 17 or more days after the flu vaccine reflected in the records "[b]ecause his symptoms started four days after the flu shot was given." Tr. 121.

On cross examination, Mrs. Musumeci confirmed she did not call a doctor until October 21, seventeen days after the vaccine. Tr. 136. She referred to petitioner's symptoms as "alarming" but then stated, "it wasn't something that I would have rushed to the doctor for, but once it didn't go away after he was having this same kind of pain," she told him he needed to go to the ER, but he wanted to wait another day. Tr. 137, 139. She stated if the pain had been "totally debilitating, he definitely would have been to the doctor beforehand". Tr. 137. She added that neither of them had ever had the flu shot before, so they didn't know what the possible side effects were. Tr. 143-44. She then stated they did not consider going to the ER or urgent care on October 21, 2013 because his doctor knows him and prescribed a Z-Pak. Tr. 144-45.

According to Mrs. Musumeci, petitioner went to work between the date of the vaccine and October 21, but only on a "limited basis" and only for a few hours a day. He did not have his usual "umph" and did not want to go anywhere because of the pain. Tr. 138-39.

Mrs. Musumeci recalled petitioner reporting pain on the right side of his face, eye drooping, his ear being clogged, and the hair pulling pain at the October 23, 2013 visit with Dr. Bell. Tr. 147-48. She believes this was the first time he mentioned facial pain. Tr. 148. Dr. Bell examined him including his eye. Tr. 148-49. Mrs. Musumeci stated the eye drooping was "definitely" present that day but agreed the record does not document eye drooping and that he was diagnosed with an ear infection and prescribed medication. Tr. 149-51; Pet. Ex. 1 at 28.

Mrs. Musumeci did not recall going to urgent care on October 28, 2013 but was pretty sure she would have taken him and that he would have provided the same complaints - persistent head pain, eye pain, and congestion. Tr. 150-51. Mrs. Musumeci read the record for that visit, "Patient reports pain of 8/10 located in [right] eye and [right] forehead and describes the pain as aching, sharp, tender. Pain has been present for 6 [d]ays." Tr. 151-52; Pet. Ex. 1 at 32. She stated that the pain being present for 6 days was "[d]efinitely incorrect," his pain had been present for probably 16 or 19 days. Tr. 152. She agreed eye drooping was not contained in the record but claimed that the record was wrong because that was why they went to urgent care. Tr. 152-53; Pet. Ex. 1 at 33. She then stated his eye drooped "since he had the shot" and did not look like that before, and everyone who saw him asked what was wrong with his eye, which is why they went to the ophthalmologist. Tr. 153-54.

Mrs. Musumeci recalled petitioner seeing Dr. Doti on October 30, 2013 but did not recall him having a cough. She then stated he had an "annoying cough" that would not leave—like a non-productive, dry cough. Tr. 154-55. She recalled the visit with Dr. Liebergall on November 4, 2013 and the history petitioner provided that day. When shown Dr. Liebergall's record documenting a swollen eye for "3 weeks," she initially agreed it was "at least three weeks", then stated it was longer than three weeks, the record was wrong, and doctors need to "document their dates correctly, because clearly there's issues in…timelines." Tr. 155-57; Pet. Ex. 1 at 40.

Mrs. Musumeci recalled that petitioner told Dr. Salomon on November 27, 2013 that he got the flu shot on October 4, 2013, had symptoms, called the doctor for an appointment on October 21, got an appointment on October 23, then went to the ophthalmologist who sent him to a neurologist and neuro-ophthalmologist. Tr. 157-59; Pet. Ex. 1 at 61. However, Dr. Salomon's record documenting right facial pain beginning 6 weeks prior to November 27, 2013 was wrong. Tr. 157-59.

Mrs. Musumeci recalled the visit with Dr. Forman on December 5, 2013 and stated that record was also wrong because it documented a flu shot six weeks prior to their visit with severe cough, right sided scalp pain, lid swelling, and severe orbital and retroorbital pain with ocular tenderness five days later. Tr. 159-60; Pet. Ex. 1 at 66. They told Dr. Forman the vaccine was October 4, 2013, not six weeks before the visit. Tr. 160.

Mrs. Musumeci stated that she remembers what petitioner reported to Dr. Napchan at their first visit on January 29, 2014 and the record is wrong. Tr. 160-61; Pet. Ex. 1 at 74. Petitioner did not tell Dr. Napchan that his eye drooping, eye pain, and head pain began three weeks after the flu vaccine and has persisted since. Tr. 161-62. His symptoms started four and half to five days after the vaccine; then from the fourth to the fifth day, he "started getting the pain in his nose—in his nose—in his eye, in his head." Tr 161-62; Pet. Ex. 1 at 74.

Mrs. Musumeci requested petitioner's medical records, but petitioner had to sign for and pick them up due to HIPAA. Tr. 163-64. She did not recall anything being blacked out in the records but there were so many that she "had to put them order" when the previous attorney sent the ones he requested. Tr. 164. She then stated that current counsel requested a second set of

records because the ones they sent her were out of order. Mrs. Musumeci has the original ones. Tr. 164-65.

On redirect, Mrs. Musumeci confirmed that that the onset of petitioner' eye drooping was October 8, 2013 and she called the doctor 12 days later, on October 21. Tr. 165-66. Counsel tried to suggest that because October 21 was a Monday, they waited to call the doctor until after the weekend, but Mrs. Musumeci responded, "Probably not". Tr. 167-68. Initially, Mrs. Musumeci said when she called the doctor's office, she spoke to whoever answered the phone, but then said she may have left a message. Tr. 168.

Counsel represented to Mrs. Musumeci that "protuberant" means "bulging" and asked if petitioner's eye was bulging. Mrs. Musumeci stated it could have been under the lid, but his eye was half closed so she didn't know, but it was red and tearing. Tr. 168-69; Pet. Ex. 1 at 28. Mrs. Musumeci repeated that the record from October 28, 2013 documenting the onset of his pain as 6 days prior to the visit was wrong. Tr. 169; Pet. Ex. 1 at 32.

It was suggested to Mrs. Musumeci by counsel that Dr. Liebergall's record documenting a 3-week history of eye pain was not complete. Mrs. Musumeci agreed then stated the record only included "bits and pieces" of what he reported. Tr. 172-73; Pet. Ex. 1 at 40. There was apparently an intake form filled out by petitioner for that visit that was not included in the records.

The conversation about how the records were secured was revisited. Mrs. Musumeci responded that she not put them order despite previously having testified to having done so. Tr. 164, 174-78.

## D. Other Evidence

### 1. Emails from Petitioner to Medical Providers

Petitioner emailed Dr. Doti on March 3, 2017 requesting information about his medical visits, specifically between October 4 and October 23, 2013. "I for some reason saw Ryan Bell on the 23rd and he states that I was in the office the prior week, but medical records shows (sic) no visit at all. There was also a script sent to CVS on 10/21/2013 by Dr. Doti for a zpak. Then on the 23rd, Ryan Bell prescribed another antibiotic. Please clarify asap as I need this information." Pet. Ex. 1 at 24. Melissa from Dr. Doti's office responded "I took a look at those dates . . . I see a 10/4/13 office visit with Dr. Doti and then 10/21/13 phone call where the zpack was prescribed, followed by the 10/23/13 Dr. Bell visit." *Id*.

### 2. Work Attendance Records

Petitioner's work attendance records since 2009 were filed. Pet. Ex. 19. Petitioner is employed by an automobile dealership. Over the time period of October 4, 2013 through October 23, 2013, petitioner worked 10.33 hours on October 4; 9.08 hours on October 5; 12.32 hours on October 7; and 12.1 hours on October 8 for a total of 58.57 hours. *Id*. at 181.

Between October 10 and October 15, petitioner worked 12 hours on October 10; 11.25 hours on October 11; 8.98 hours on October 12; 9.6 hours on October 14; and 11.07 hours on October 15 for a total of 52.9 hours. Pet. Ex. 19 at 182.

Between October 17 and October 22, petitioner worked 8.32 hours on October 17; 6.15 hours on October 18; 2.67 hours on October 20; and called in sick on October 21 and October 22, 2013. Pet. Ex. 19 at 183. He worked a total of 21.95 hours that week. *Id.*

Between October 24 and October 29, petitioner worked 8.88 hours on October 24; 10.18 hours on October 25; 7.33 hours on October 26; 5.9 hours on October 27; 8.17 hours on October 28; and 9.38 hours on October 29 for a total of 49.85 hours. Pet. Ex. 19 at 184.

Between October 31 and November 5, petitioner worked 8.52 hours on October 31; 8.8 hours on November 1; 8.4 hours on November 2; 9.38 hours on November 4; and 11.78 hours on November 5 for a total of 46.88 hours. Pet. Ex. 19 at 185.

The records continue in similar fashion thereafter through 2021 with some notations regarding missing records due to the company changing hands. Petitioner's work attendance records contain no entries for days he was off or not scheduled to work. However, the record documents his work schedule, times he called in sick and vacation time. Pet. Ex. 19 at 193; *see generally* Pet. Ex. 19.

### 3. Health Insurance Billing

Petitioner's health insurance billing record confirms that petitioner received the flu vaccine at a visit to Dr. Doti on October 4, 2013. Pet. Ex. 24 at 3. He was not seen again for medical care until October 23, 2013. The billing record is consistent with his medical records. *Id.* at 3-15.

### 4. VAERS Report

On September 25, 2016, three years after the events, petitioner completed and submitted a VAERS report which contains receipt of a flu vaccine at 3:00pm on October 4, 2013, then "cold like symptoms, severe eye pain, behind eye socket, pain on right side, top of head as if someone was pulling my hair. Right eye lid started to droop" beginning at 9:00am on October 9, 2013. Pet. Ex. 3 at 2. The VAERS report further includes that petitioner "[r]equired Emergency Room/Doctor Visit" which "Resulted in Permanent Disability" from which he has not recovered. *Id.* at 2-3. He underwent "mri's, mra', ct scan of chest, carotid artery study, mrv, neuro opthamology (sic) vision testing, blood work to rule out various diseases". *Id.* at 3.

## II.    Legal Standards Regarding Fact Finding

Petitioner bears the burden of establishing his claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the weight generally given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994)

(explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

### III.    Discussion

For the reasons discussed below, I find the contemporaneous medical records more persuasive than the affidavits and testimony provided years after the events. Accordingly, the evidence supports that petitioner received a flu vaccine on October 4, 2013, first contacted Dr. Doti's office on October 21, 2013 with complaints of a cough and sinus infection, presented to Dr. Bell at Dr. Doti's office on October 23, 2013 for worsening of cough, sinus pain, and right facial pain, and thereafter developed eye and right-sided head pain which progressed to eye drooping, severe head pain, and eventual diagnoses and treatment for chronic migraines and Horner's syndrome. *See Gerami*, No. 12-442V, 2013 WL 5998109, at *4; *Campbell*, 69 Fed. Cl. at 779.

### A.    The Affidavits

Petitioner's and Mrs. Musumeci's affidavits were written six and eight years after the events, three and five years after the petition was filed, and over a year after Dr. Forman issued his initial report opining that five days after the influenza vaccine would be an appropriate timeframe for the flu vaccine to be the cause of petitioner's chronic migraines and Horner's Syndrome. *See* ECF Nos. 25, 29, 31, 33. Both petitioner and Mrs. Musumeci affirmed that five days after petitioner's receipt of the October 4, 2013 flu vaccine, he had an onset of symptoms of the injuries claimed. Pet. Ex. 12 at 2; Pet. Ex. 13 at 1; Pet. Ex. 15 at 1-2.

Petitioner affirmed that he developed a "severe cough with a deep congestion, dizziness, pain in [his] right eye, pain in the right side of [his] head-scalp area, right eye lid swelling, right eye lid drooping, pain in [his] jaw, and an overall feeling of inability to function normally" five days after the flu vaccine. Pet. Ex. 12 at 2; Pet. Ex. 15 at 1-2.

Mrs. Musumeci affirmed that "[a]bout 4-5 days" after the October 4, 2013 flu vaccine, petitioner complained that he was "very congested, had a cough and flu-like symptoms"; he also had jaw pain and "severe pain on the right top side of his head, a severe pain behind his right eye, and his right eyelid was drooping, and his eye was watering"; he felt as though someone was pulling the hair out of his head. Pet. Ex. 13 at 1; Pet. Ex. 16 at 1. "After twelve days of watching [her] husband in excruciating pain", she called the doctor. Pet. Ex. 16 at 2.

### B.    The Testimony

Petitioner testified that he was fine until the fourth day after receipt of the flu vaccine— October 8, 2013. Tr. 10, 34, 35. He first stated his symptoms began the afternoon of October 8, but later stated his right eye was drooping that morning. Tr. 36-38, 40, 84. He also stated that he had chest and head pain, cough, congestion, and chills, which progressed throughout the day and night, with pain in his jaw, eye, top of his head, and forehead that felt like "someone pulling your hair". Tr. 10-11, 39, 42, 43. He also had dizziness that began between four and five days after the

vaccine and could not leave the house. He "laid in bed for almost two weeks afterwards." Tr. 12, 43-44. On October 9, the pain in his right eye and head worsened and his eye closed. Tr. 46-48.

Petitioner was questioned several times about the inconsistencies between the reported onset of symptoms in his affidavits, hearing testimony, and the medical records. His response was simply that all the medical records on onset were wrong. Tr. 21, 22, 65-66, 76, 79-80, 84, 86, 89, 91, 101-02. However, his initial testimony at hearing was telling. He stated that he visited Dr. Bell on October 23, 2013, was diagnosed with a sinus infection, prescribed a stronger antibiotic that did not work, then had worsening pain over the following week, and ultimately his right eye swelled and closed. Tr. 15-17.

Mrs. Musumeci testified that petitioner had an onset of cold symptoms, achiness, and a scratchy throat the day after he received the flu vaccine. Tr. 110-11, 118, 125-26, 127. His symptoms were "very, very mild, until the fourth day when it got worse" and the eye and head pain began. Tr. 112-13, 117-18, 128, 132, 136. She stated the hair pulling feeling began "maybe the fifth or sixth day" after the vaccine. Tr. 113-14.

Mrs. Musumeci agreed that she never mentioned eye drooping in her phone call to the PCP on October 21, 2013, only his cough and sinus infection. Tr. 115-16, 141-42, 144-47. She insisted that petitioner's eye drooping was present at the October 23, 2013 PCP visit, but agreed it was not contained in the record. Tr. 149; Pet. Ex. 1 at 28. She, like petitioner, stated that the medical records documenting the onset of petitioner's eye drooping and head pain were wrong, insisting that "… his symptoms started four days after the flu shot was given." Tr. 121, 136, 152-53, 155-62, 169. Both agreed that the remainder of the medical records accurately reported petitioner's complaints regarding his symptoms. Tr. 22, 52, 125, 162-63.

## C. The Weight of the Evidence Favors the Contemporaneous Medical Records Over the Affidavits and Testimony

The undersigned recognizes that over time memories naturally fade, and timeframes lose their clarity. What one believes as true many years later may not accurately reflect the events or timing of events as accurately as what is contained in records created contemporaneously with the events as they are occurring. However, the testimony and affidavits provided by petitioner and his wife cannot be reconciled with the contemporaneous medical records and the timeline of events contained therein.

The contemporaneous medical records filed in this case are more persuasive and present a more reliable timeline of events. The records support the following: Petitioner received the flu vaccine on October 4, 2013. Seventeen days later, there was communication with petitioner's PCP reporting a cough and sinus infection, and an antibiotic was prescribed. Pet. Ex. 1 at 23. Petitioner presented to his PCP on October 23, 2013 reporting cough, sinus pain, right sided facial pain, and ear fullness. *Id*. at 26. On October 28, 2013 he presented to urgent care reporting right eye pain and right forehead pain of 8/10 present for 6 days. *Id*. at 31-32. On October 30, 2013, he presented to his PCP reporting right sided sinus issues, right eye puffiness, and pins and needles to the right side of head. Right sided facial swelling was noted on examination. *Id*. at 36-37. On November 4, 2013, petitioner presented to his family eye doctor reporting pain around the orbit of his right eye

and into his skull which felt like his hair was being pulled beginning 3 weeks ago. This was the first visit that a medical provider documented "mild ptosis" or eye drooping. *Id*. at 40. On November 8, 2013, petitioner returned to the PCP reporting cough, pain in his right eye and top of his head, and right eye lag and puffiness. *Id*. at 42-44. On November 13 and 27, 2013 petitioner presented to Dr. Salomon reporting right facial and forehead pain sensitive to the touch for 5 and 6 weeks, respectively, and a flu vaccine five days prior.[45] The November 13, 2013 visit was the first mention of his flu vaccine. On December 5, 2013, petitioner presented to Dr. Forman for right eye ptosis as the primary complaint. Dr. Forman's handwritten note[46] documents that the right eye ptosis "began six weeks ago" and there is a space in the record before the next entry of "5d[ays] after flu shot – sick [and] cough, R ear pain, got Z pack (c/o pain as well) then Augmentin – still cough & pain R side of orbit + head very sore eye lid & eyeball". *Id*. at 68. However, in an undated letter to Dr. Salomon, Dr. Forman wrote that petitioner presented for evaluation of right upper lid ptosis with a history of flu shot six weeks ago after which he developed "a severe cough, right sided scalp pain, lid swelling, severe orbital and retro-orbital pain with ocular tenderness. The right upper lid then drooped and pain in the right scalp also persisted." *Id*. at 66. Two months later, petitioner presented for pain management with Dr. Napchan reporting that five days after an October 2013 flu shot, he had some nasal congestion, coughing, wheezing, generalized malaise, and difficulty sleeping. He was prescribed a Z-PAK and Levaquin. "Three weeks later he reports that he noticed his right eye being droopy, right retroorbital pain and pain in the right frontal and temporal regions." *Id*. He has had pain ever since with eye redness but no tearing, right nasal congestion, ipsilateral photophobia, and light and sometimes heat sensitivity.

Succinctly, petitioner's reporting to his various medical providers supports that he first suffered from a cough and cold-like symptoms roughly 5 days after his receipt of the flu vaccine which was of no import until October 21, 2013 when his wife called the PCP reporting a cough and sinus infection and asking what to do. No other complaints were reported at that time and there was no mention of eye drooping or severe eye or head pain. His condition worsened despite medication, and he presented to the PCP on October 23, 2013 for cough, eye puffiness, and right sided facial pain. He did not report eye or head pain and was not noted on examination to have eye lag or ptosis. He then presented on October 30, 2013 with 8/10 head pain. Right eye ptosis was noted for the first time on November 4, 2013. Petitioner first mentioned his flu vaccine when he presented to Dr. Salomon on November 13 and Dr. Forman on December 5, but did not provide the date of the vaccination. Both doctors documented the onset of symptoms as 5 and 6 weeks prior to the visits with them with a flu vaccine 5 days prior. However, Dr. Forman's handwritten note and letter to Dr. Salomon are inconsistent on the timeline. Thereafter, petitioner's reported history to Dr. Napchan is consistent with his October 2013 medical records that he initially had cold-like symptoms treated with medications and three weeks later noticed right eye drooping and had severe head pain. Looking at the records as a whole, this suggests that Dr. Salomon's and Dr. Forman's records from November 13 and December 5 documenting onset 5 and 6 weeks prior his visits with them and a flu vaccine 5 days prior to the onset of his symptoms was either due to inaccurate reporting from petitioner, inaccurate recording by the provider, or conflating his report of onset of cold-like symptoms and cough 5 days after his receipt of the flu vaccine with the subsequent development of right eye puffiness, eye pain, and severe right head pain leading to his being referred to them, a neurologist and neuro-ophthalmologist.

---

[45] Petitioner's flu vaccine was eight weeks prior to this visit. Pet. Ex. 1 at 21, 61.
[46] A copy of the relevant portion of this record is included herein on page 7.

It is difficult to accept that petitioner had an onset of debilitating eye and head pain with eye drooping within 4-5 days of the flu vaccine but did not contact a medical provider or seek medical attention for almost three weeks particularly in light of petitioner and his wife testifying and affirming that petitioner was unable to work or partake in any of his regular activities between October 9 and October 23, 2013. Tr. 12, 114; Pet. Ex. 1 at 15, 21. Further, petitioner's work attendance records confirm that he worked over 50 hours per week between October 4, 2013 and October 18, 2013. *See* Pet. Ex. 19 at 181-83. His work schedule further shows he was not scheduled to work on October 19, 2013. *Id*. at 183. Then on October 20, 2013, he worked only 2.67 hours and took sick leave on October 21 and October 22, then worked his full-time hours thereafter. *Id*. Petitioner's work records, like his contemporaneous medical records, do not support the facts on onset as told by petitioner and Mrs. Musumeci.

I found particularly compelling the history petitioner provided to Dr. Napchan on January 29, 2014 which included cold-like symptoms and a cough that developed after receipt of the flu vaccine, followed "[t]hree weeks later" by eye drooping, right retroorbital pain, and pain in the right frontal and temporal regions. Pet. Ex. 1 at 74. This record is consistent with petitioner's initial testimony when he saw Dr. Bell on October 23, 2013, was diagnosed with a sinus infection and prescribed a stronger antibiotic, but the medication did nothing, and his pain got worse over the following week, and his right eye swelled and closed. Tr. 15-17. It is also consistent with the timeline contained in the medical records beginning on October 23, 2013, at which time he reported cold-like symptoms, cough, and right facial pain, then days later reported intense head pain, followed thereafter with the development of eye pain then eye drooping. Pet. Ex. 1 at 23, 26-29, 31-34, 36-38. Given the foregoing inconsistencies, I find it appropriate to afford more weight to the contemporaneous medical records and find that the onset of the symptoms associated with Horner's syndrome and chronic migraines which petitioner has since been diagnosed with and treated for began on October 23, 2013 when petitioner presented with right-sided facial pain that progressed to head pain, right orbital pain, and eye drooping. *See, e.g*., Tr. 12, 39, 41-42, 43-44, 82-83, 128, 136, 153-54; Pet. Ex. 12 at 1-2; Pet. Ex. 13 at 1; Pet. Ex. 15 at 1-2; Pet. Ex. 16 at 1; *Gerami*, No. 12-442V, 2013 WL 5998109, at *4; *Campbell*, 69 Fed. Cl. at 779; *La Londe*, 110 Fed. Cl. at 203-04.

While this is an onset ruling, it is noted that petitioner alleged that he suffered from Raeder's syndrome,[47] Horner's syndrome,[48] and hemicrania continua[49] and other injuries resulting from his October 4, 2013 flu vaccine. Following extensive testing, all of which yielded normal results, petitioner was diagnosed with Horner's syndrome and chronic migraines for which he is receiving treatment. The conditions/injuries alleged to have been caused by the flu vaccine do not present with symptoms of chronic cough, sinus infection, ear infection, fatigue, or chest heaviness, all of which petitioner suffered following the flu vaccine. A diagnosis of Raeder's syndrome was not confirmed and hemicrania continua was ruled out.[50] Thus, I find that petitioner developed the symptoms of severe right-sided facial pain, head pain, eye drooping, redness, and tearing indicative

---

[47] *Supra* note 3.
[48] *Supra* note 4.
[49] *Supra* note 5.
[50] Dr. Forman specifically noted that hemicrania continua had been ruled out. Pet. Ex. 11 at 1.

of his ultimate diagnoses of Horner's syndrome and chronic migraines beginning on October 23, 2013.

### IV.    Conclusion

As set forth above in detail, the onset of the symptoms associated with the injuries petitioner alleges to have been caused by his October 4, 2013 flu vaccine began on October 23, 2013. Pet. Ex. 11 at 1. Petitioner's expert must rely on the facts and contemporaneous medical records as set forth in this Ruling and not on the affidavits and testimony of petitioner and his wife to satisfy *Althen* Prong III. In addition, since petitioner's expert has not yet provided a mechanism sufficient to satisfy *Althen* Prongs I or II, he must do so based on the facts and timing as set forth herein. His expert report must also address the petitioner's upper respiratory and/or sinus infection that he suffered 4-5 days following his receipt of the flu vaccine and the role, if any, that it played in petitioner's development of his chronic migraines and Horner's syndrome on October 23, 2013.

The following is hereby ordered:

**By no later than <u>Monday, February 3, 2025</u>,** petitioner shall file an expert report as set forth in this Ruling.

**IT IS SO ORDERED.**

<u>s/ Mindy Michaels Roth</u>
Mindy Michaels Roth
Special Master