# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: May 21, 2026

```
* * * * * * * * * * * * * * *   *
JEFFREY D. MUSUMECI,            *
                                *
                                *
            Petitioner,         *      No. 16-1232V
                                *
v.                              *      Special Master Young
                                *
SECRETARY OF HEALTH             *
AND HUMAN SERVICES,             *
                                *
                                *
            Respondent.         *
* * * * * * * * * * * * * * *   *
```

*Patricia Ann Finn*, Patricia Finn, P.C., Pearl River, NY, for Petitioner.
*Michael Bliley*, United States Department of Justice, Washington, DC, for Respondent.

## DECISION ON ENTITLEMENT[1]

On September 30, 2016, Jeffrey Musumeci ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Pet., ECF No. 1. Petitioner alleged that he received an influenza ("flu") vaccine on October 4, 2013, and, as a result, suffers from paratrigeminal oculosympathetic ("Raeder's") syndrome, Horner's syndrome, and hemicrania continua. Am. Pet., ECF No. 13.

An onset hearing was held on November 10, 2021. Min. Entry, dated Nov. 10, 2021; Tr. On December 4, 2024, the presiding special master issued a fact ruling ("Ruling") on onset and diagnosis. ECF No. 84. She noted that "[P]etitioner alleged that he suffered from Raeder's syndrome, Horner's syndrome, and hemicrania continua, and other injuries resulting from his October 4, 2013 flu vaccine." *Id.* at 24. However, "[a] diagnosis of Raeder's syndrome was not confirmed and hemicrania continua was ruled out." *Id.* Ultimately, she found that Petitioner "developed the symptoms of severe right-sided facial pain, head pain, eye drooping, redness, and

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

tearing indicative of his ultimate diagnoses of Horner's syndrome[3] and chronic migraines beginning on October 23, 2013," or 19 days after vaccination. *Id.* at 24–25.

A careful analysis and weighing of all the evidence presented in this case, consistent with the factual findings previously rendered, and in accordance with the applicable legal standards,[4] reveals that Petitioner has failed to provide preponderant evidence that the flu vaccine he received on October 4, 2013, was the cause-in-fact of his Horner's syndrome or chronic migraines. Accordingly, Petitioner is not entitled to an award of compensation.

## I.   Background

### A.   Factual History

Petitioner's medical history is detailed in the Ruling. ECF No. 84 at 3–8. As the previous special master interpreted the factual record and issued reasoned findings that are relied upon herein, they will not be repeated here. ECF No. 84. Similarly, the affidavits, testimony, and other evidence,[5] including emails, work records, and insurance billing, are laid out in the Ruling. *Id.* at 8–19. These filings and the Ruling's discussion of them primarily address onset and thus will not be repeated here. *Id.*

### B.   Post-Ruling Procedural History

The early procedural history through 2022, prior to the issuance of the Ruling, is set forth therein and will not be repeated here. *See* ECF No. 84 at 2–3.

The special master's December 4, 2024 Ruling ordered Petitioner to file an expert report addressing all three *Althen* prongs consistent with her factual findings. ECF No. 84 at 25. Thereafter, Petitioner filed a supplemental expert report from his expert, Scott Forman, M.D. Pet'r's Ex. 33, ECF No. 88. He opined Petitioner's "symptoms appeared within [four to five] days of vaccination, a timeframe consistent with immune-mediated neurological reactions." *Id.* at 3.

Respondent subsequently requested a status conference to discuss Dr. Forman's expert report, as it was inconsistent with the findings in the Ruling and not compliant with Court orders.

---

[3] Horner's syndrome is the "sinking in of the eyeball, ptosis of the upper eyelid, slight elevation of the lower lid, constriction of the pupil, narrowing of the palpebral fissure, and anhidrosis and flushing of the affected side of the face." *Horner Syndrome*, DORLAND'S ONLINE MED. DICTIONARY, https://www.dorlandsonline.com/dorland/definition?id=110749 (hereinafter, "DORLAND'S").
It is "caused by a brainstem lesion on the ipsilateral side that interrupts sympathetic nerve fibers." *Id.*

[4] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the Ruling will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[5] Petitioner filed two expert reports (both authored by Dr. Scott Forman) on March 20, 2018, and July 18, 2018, prior to issuance of the special master's Ruling and are inconsistent with her findings of fact. Pet'r's Exs. 5, 10.

Min. Entry, dated Mar. 21, 2025; ECF No. 89.[6] During the status conference, the presiding special master noted that "vaccine caselaw is clear that where an expert bases their opinion on facts unsupported by the evidence, a special master may properly reject that expert's opinion." ECF No. 93 at 2. Petitioner expressed the desire to present additional evidence consistent with the onset ruling as well as additional opinions on *Althen* prongs one and two, also based on findings in the Ruling. *Id.* Petitioner was granted that opportunity and filed two supplemental expert reports from Dr. Forman; Respondent followed with a responsive expert report from his expert, Gregory Van Stavern, M.D. ECF No. 90;[7] Pet'r's Ex. 34, ECF No. 94; Resp't's Ex. A, ECF No. 96.

On February 2, 2026, Petitioner filed a status report indicating no further expert reports would be filed. ECF No. 97. The case was reassigned to my chambers on March 17, 2026. *See* ECF Nos. 98–99. On May 14, 2026, I issued an order stating that "[b]ased on the submission of evidence after the [Ruling] and the parties' indication that no further evidence would be presented, this case is now ripe for a decision on the merits." ECF No. 100. I gave the parties one final opportunity, if they wished, to submit any additional evidence for consideration. I advised that if nothing was filed by the deadline given, the evidentiary record would be closed, and a decision would issue. *Id.* On May 15, 2026, Petitioner filed a status report in response to my order. ECF No. 101. Petitioner requested that I

> review the transcript of the March 21, 2025 status conference (ECF No. 93) alongside the Order of March 21, 2025 (ECF No. 89) and the . . . Order of May 12, 2025 (ECF No. 91), so that counsel's actual representations regarding Dr. Forman, and the record evidence concerning his review of Petitioner's medical history, are reflected accurately in the record.

*Id.* at 4.[8] Petitioner further indicated that he "does not seek to reopen any prior ruling and stands ready for a decision on the merits." *Id.*

This matter is now ripe for consideration.

### C. Expert Reports

#### 1. Scott Forman, M.D.[9]

Dr. Forman submitted two expert reports prior to the Ruling. Pet'r's Exs. 5, 10. His first report was one page long and he largely outlined Petitioner's clinical course. Pet'r's Ex. 5 at 1. He wrote, "I conclude so with a reasonable degree of medical certainty, the logical sequence of events, and the temporal relation between his flu vaccine and the onset of symptoms suggests the vaccine he received caused vaccine induced trigeminal neuralgia." *Id.* His second expert report again outlined Petitioner's clinical course and added,

---

[6] This status conference was recorded, and a transcript is located at ECF No. 93.

[7] Petitioner did not label this with an exhibit number.

[8] I have reviewed all docket entries, including the specific ones Petitioner requested. However, a discussion of those filings is not relevant to a decision on causation and thus will not be discussed further.

[9] Dr. Forman is one of Petitioner's treating physicians. He is an Associate Professor of Ophthalmology, Neurology, and Neurosurgery at Somers Eye Center. *See* Pet'r's Ex. 5 at 1; Pet'r's Ex. 33 at 1. He is board certified in ophthalmology. Pet'r's Ex. 7 at 1.

> Administration of the flu vaccine is known to cause the development of antibodies to the [flu] virus in the vaccine. Autoimmunity may develop in which antibodies cross react with normal tissues to produce a pathologic response, e.g., optic neuritis developing after flu vaccine or other vaccines. It is certainly possible that an autoimmune reaction developed against sympathetic and trigeminal nerves here to cause an autoimmune type reaction rendering the patient with the oculosympathetic paresis and dysesthesia in the trigeminal nerve. There are reports in the literature of oculosympathetic paresis with and without pain occurring in association with Zoster infection and these are presumed to be an autoimmune reaction. Therefore the possibility exists that administration of attenuated [flu] virus could cause an autoimmune reaction of a similar nature.

Pet'r's Ex. 10 at 1–2. Dr. Forman also opined that Petitioner's "neuro-ophthalmic findings have been reported as a response to the flu shot. The flu itself, or any other upper respiratory infection has not been reported in the medical literature to be associated with or causally related to a Horner's syndrome without anisocoria and/or Raeder's paratrigeminal neuralgia." *Id.* at 1.

After the Ruling, Dr. Forman's first post-Ruling report reiterated that Petitioner's "symptoms appeared within [four to five] days of vaccination, a timeframe consistent with immune-mediated neurological reactions." Pet'r's Ex. 33 at 3. As to *Althen* prong one, Dr. Forman wrote,

> The pathophysiological mechanism underlying this case aligns with established immunological responses to vaccination:
>
> a. The flu vaccine is designed to stimulate an immune response by introducing viral antigens that trigger the production of antibodies.
>
> b. Vaccine-induced autoimmunity is a well-documented phenomenon in which the immune system mistakenly attacks host tissues, leading to conditions such as Guillain-Barré syndrome and optic neuritis. (ECF No. 33-2, Pet. Ex. 6; ECF No. 37-1, Pet. Ex. 9).
>
> c. In this case, the flu vaccine likely triggered an autoimmune reaction targeting the ocusympathetic and trigeminal nerves, leading to Horner's syndrome and Raeder's paratrigeminal neuralgia. (ECF No. 33-1, Pet. Ex. 5; ECF No. 40-1, Pet. Ex. 10).
>
> d. Published literature has documented cases of post-vaccination oculosympathetic paresis and neuralgic complications, supporting the plausibility of this mechanism. (ECF No. 33-2, Pet. Ex. 6; ECF No. 37-1, Pet. Ex. 9).
>
> Thus, it is *more likely than not* that Mr. Musumeci's injuries resulted from an immune-mediated inflammatory response to the flu vaccine.

*Id.* at 2. He summarized that the "flu vaccine can provoke an autoimmune response leading to inflammation and dysfunction of sympathetic and trigeminal nerves, consistent with [Petitioner's] diagnosed conditions." *Id.* at 3.

Dr. Forman's second post-Ruling report "acknowledge[d] and adopt[ed] the [s]pecial [m]aster's factual finding" on onset and provided a "revised causation theory." ECF No. 90 at 1. Dr. Forman opined a "19-day onset is still medically appropriate for an autoimmune neurologic

reaction following vaccination." *Id.* at 2. "Autoimmune inflammatory responses are not always immediate and may occur up to several weeks post-exposure, as seen in post-vaccination cases of Guillain-Barré Syndrome [("GBS")] and optic neuritis." *Id.* at 2–3. He opined the "delay in symptom onset may reflect a subclinical phase of immune priming, followed by targeted inflammation in vulnerable neural tissue." *Id.* at 3. Furthermore, "[l]iterature cited in prior expert reports supports a range of onset from days to several weeks, consistent with the court's finding of October 23, 2013 as symptom onset." *Id.* He continued,

> It remains medically plausible that the influenza vaccine administered on October 4, 2013 triggered an autoimmune-mediated inflammatory reaction resulting in Horner's Syndrome and Raeder's Paratrigeminal Neuralgia, which manifested on October 23, 2013.
>
> Specifically:
>
> - The influenza vaccine contains viral antigens that stimulate immune activation. In rare cases, such activation leads to molecular mimicry and autoimmune targeting of components of the nervous system.
>
> - The oculosympathetic pathway, responsible for pupillary dilation and eyelid elevation, can be affected by autoimmune inflammation, resulting in ptosis, miosis, and facial pain consistent with Mr. Musumeci's diagnosis.
>
> - Peer-reviewed literature documents cases of cranial nerve dysfunction, including trigeminal and sympathetic nerve involvement, following vaccination. These cases support the mechanism by which vaccine-induced cross-reactivity could cause focal neuropathies.

*Id.* at 2. He concluded, the flu vaccine "triggered a biologically plausible immune-mediated neuropathy affecting the oculosympathetic and trigeminal pathways," there is "a logical sequence of cause and effect between the vaccination and [Petitioner's] symptoms," and a "19-day onset remains within the medically accepted timeframe for post-vaccination autoimmune injury." *Id.* at 3.

In his third and final post-Ruling report, Dr. Forman stated that a "scientifically sound theory exists explaining how the [flu] vaccine can trigger an autoimmune cascade resulting in Horner's syndrome with trigeminal involvement known as Raeder's paratrigeminal neuralgia."[10] Pet'r's Ex. 34 at 1. He characterized his causation theory as "[a]utoimmune [n]europathy via [m]olecular [m]imicry." *Id.* at 2. "The flu vaccine contains antigens designed to stimulate immune responses against [flu] strains. In rare cases, molecular mimicry causes cross-reactivity between vaccine antigens and host neural tissue, including the sympathetic and trigeminal nerves." *Id.*

---

[10] Dr. Forman opined that Raeder's paratrigeminal neuralgia is a "subcategory" of Horner's syndrome. Pet'r's Ex. 34 at 2. Specifically, that Horner's syndrome with trigeminal involvement is known as Raeder's paratrigeminal neuralgia. *Id.* However, he did not provide any literature to support this contention, and the Ruling found Raeder's syndrome was not a confirmed diagnosis.

1. **Antigenic mimicry and immune activation.**
   The influenza vaccine contains hemagglutinin and neuraminidase antigens intended to stimulate B- and T-cell responses. In rare cases, these immune responses cross-react with host tissues, a process known as molecular mimicry. (See Wucherpfennig & Strominger, *Cell*, 1995; Rose, *NEJM*, 2001).
2. **Targeting of sympathetic and trigeminal pathways.**
   In Mr. Musumeci's case, the oculosympathetic pathway, which innervates the dilator pupillae muscle and Müller's muscle of the eyelid, and trigeminal sensory fibers (V1 and V2) were affected. Both are rich in myelinated fibers and express ganglioside-like structures susceptible to immune attack (analogous to anti-GQ1b syndromes, e.g., Miller Fisher Syndrome following influenza vaccination).
3. **Inflammatory infiltration without systemic infection.**
   As with post-vaccinal neuritis (e.g., Guillain-Barré Syndrome), localized autoimmune inflammation can cause regional demyelination or conduction block without systemic manifestations. (See Yuki & Hartung, *Lancet Neurol*, 2012).

*Id.*[11] He added, "[t]his autoimmune mechanism is well established in post-vaccination neuropathies such as [GBS], Miller Fisher Syndrome, and optic neuritis, and similar pathways may underlie focal cranial nerve involvement." *Id.* For "[l]iterature [s]upport," Dr. Forman cited a case report of "analogous complications with other post-vaccine syndromes, particularly involving oculosympathetic paresis and trigeminal dysfunction." *Id.* at 2–3 (citing Pet'r's Ex. 6; Pet'r's Exs. 8–9).[12]

Citing Demmler & Heidel, Dr. Forman reiterated that a "19-day latency period is consistent with known immune-mediated vaccine responses, which typically emerge within [five] to 42 days post-injection. This window is consistent with published literature on other post-vaccination autoimmune neuropathies and aligns with the Court's determination of onset." Pet'r's Ex. 34 at 3 (citing Pet'r's Ex. 9). He added that Petitioner's "[s]inusitis and upper respiratory infection were treated empirically with no radiologic confirmation and do not explain the sympathetic denervation pattern." *Id.* The Demmler & Heidel article followed a patient who, in 1954, was treated for neuropathy during a virus infection. Pet'r's Ex. 9 at 1. "After a [flu] vaccination in 1981[,] she had 12 weeks of a constant local reaction. Two days after [flu] vaccination in 1982[,] the patient complained of a 'strange feeling' in her face, headaches," and blurred vision. *Id.* at 1–2. The goal of this paper was "to focus only on the complications of the brain nerves after [flu] vaccination." *Id.* at 3. The authors concluded that

> if one accounts for and adds the long lasting [flu] symptoms of 1954 and the harsh vaccine reactions of 1981, one can appreciate a connection between vaccine and disease with a higher likelihood. Also, one can appreciate a connection between the vaccination time and disease occurrence [two days]. However, as with many atypical vaccine reactions, the exact proof of injury cannot be determined.

*Id.*

---

[11] The literature cited in this block quote was not filed.

[12] Exhibit 8 is in German; the abstract, in English, is filed as Exhibit 6; it is filed in a fully translated form as Exhibit 9. M. Demmler & G. Heidel, *Trigeminus-Affektion Nach Influenza-Schutzimpfung* [*Trigeminal Involvement Following Preventive Influenza Vaccination*], 37 PSYCHIATRIE, NEUROLOGIE, UND MEDIZINISCHE PSYCHOLOGIE, 428 (1985).

6

Dr. Forman summarized, the flu "vaccine administered on October 4, 2013[,] caused [Petitioner's] Horner's [s]yndrome and Raeder's [p]aratrigeminal [n]euralgia by triggering an autoimmune inflammatory process targeting cranial nerves causing migraines. Pet's Ex. 34 at 3–4.

### 2. Gregory Van Stavern, M.D.[13]

Respondent filed one expert report from Dr. Van Stavern. Resp't's Ex. A. He opined that Horner's syndrome does not have "an established autoimmune mechanism or precedent linking it to vaccination." Resp't's Ex. A at 2, 4. "Unlike GBS, ADEM, or post-vaccination optic neuritis—conditions with established immune mechanisms, well known disease associations, and risk factors—Horner's syndrome is a non-specific clinical sign indicating oculosympathetic pathway injury from heterogeneous, usually structural or ischemic causes (notably carotid dissection)." *Id.* at 3–4. "There is no credible evidence that vaccines can trigger an autoimmune process selectively targeting the ocular sympathetic pathway to produce isolated Horner's." *Id.* Dr. Van Stavern explained that he "could not identify a single case report of vaccine-related isolated Horner's syndrome." *Id.* at 4.

Dr. Van Stavern also opined there is no evidence of an autoimmune process here. Resp't's Ex. A at 4–5. There were no inflammatory signs, abnormal imaging or "infectious process attributable to vaccination." *Id.* at 5. "There is no evidence in the clinical record supporting an immune-driven vaccine complication." *Id.* Dr. Van Stavern briefly responded to Dr. Forman's opinions with respect to *Althen* prong three, stating,

> While the temporal relationship (symptom onset within weeks of vaccination) is acknowledged, timing alone **cannot establish causation**, particularly where:
>
> - the mechanism is not immunologic, and
> - the patient had more plausible alternative triggers
>
> The temporal relationship here is **too nonspecific** to support causation in the absence of a biologically credible mechanism.

*Id.*

## II.    Discussion

### A.  Standards of Adjudication

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the timeframe prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as amended by 42 C.F.R. § 100.3; or (2) that petitioner suffered an "off-Table injury," one not listed on the Table, as a result of his receiving a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319-20 (Fed. Cir.

---

[13] Dr. Van Stavern is a Professor of Ophthalmology and Visual Sciences and Neurology at Washinton University in St. Louis School of Medicine. Resp't's Ex. A at 1. He is a board-certified neurologist and fellowship-trained neuro-ophthalmologist. *Id.*

2006). Petitioner does not allege a Table injury in this case. Thus, he must prove either that his injury was caused-in-fact by a Table vaccine.

To establish causation-in-fact, a petitioner must demonstrate by a preponderance of the evidence that the vaccine was the cause of the injury. 42 U.S.C. § 300aa-13(a)(1)(A). A petitioner is required to prove that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321–22 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)).

In the seminal case of *Althen v. Sec'y of the Dept. of Health & Hum. Servs*, the Federal Circuit set forth a three-pronged test used to determine whether a petitioner has established a causal link between a vaccine and the claimed injury. *See* 418 F.3d at 1278–79. The *Althen* test requires petitioners to set forth: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. To establish entitlement to compensation under the Program, a petitioner is required to establish each of the three prongs of *Althen* by a preponderance of the evidence. *See id.*

Under the first prong of *Althen*, a petitioner must offer a scientific or medical theory that answers in the affirmative the question: "can the vaccine[] at issue cause the type of injury alleged?" *See Pafford v. Sec'y of Health & Hum. Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. den'd*, 64 Fed. Cl. 19 (2005), *aff'd*, 451 F.3d 1352 (Fed. Cir. 2006). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. *Id.* at 548–49 (explaining that such a theory need only be "legally probably, not medically or scientifically certain."); *see also Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *Veryzer v. Sec'y of Health & Hum. Servs.*, 98 Fed. Cl. 214, 223 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"), *aff'd* 475 F. App'x 765 (Fed. Cir. 2012).

Petitioners are not required to identify "specific biological mechanisms" to establish causation, nor are they required to present "epidemiologic studies, rechallenge[] the presence of pathological markers or genetic disposition, or general acceptance in the scientific or medical communities." *Capizzano*, 440 F.3d at 1325 (quoting *Althen*, 418 F.3d at 1280). Scientific and "objective confirmation" of the medical theory with additional medical documentation is unnecessary. *Althen*, 418 F.3d at 1278–81; *see also Moberly*, 592 F.3d at 1322. However, as the Federal Circuit has made clear, "simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citing *Moberly*, 592 F.3d at 1322). Indeed, the Federal Circuit has "consistently rejected theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." *Boatmon*, 941 F.3d at 1360 (citing *Moberly*, 592 F.3d at 1322; *LaLonde*, 746 F.3d at 1339). Rather, "[a] petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case." *Moberly*, 592 F.3d at 1322. In general, "the statutory standard of preponderance of the evidence requires a petitioner to demonstrate that the vaccine more likely than not caused the condition alleged." *LaLonde*, 746 F.3d at 1339.

Furthermore, establishing a sound and reliable medical theory connecting the vaccine to the injury often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1361 (Fed. Cir. 2000). If Petitioner relies upon a medical opinion to support his theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) ("The special master's decision oftentimes is based on the credibility of the experts and the relative persuasiveness of their competing theories"); *Perriera v. Sec'y of Health & Hum. Servs.*, 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing *Fehrs v. United States*, 620 F.2d 255 (Ct. Cl. 1980))).

Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." *Capizzano*, 400 F.3d at 1325. Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. *Id.* at 1325–26.

Under the second prong of *Althen*, a petitioner must prove that the vaccine actually did cause the alleged injury in a particular case. *See Pafford*, 2004 WL 1717359, at *4; *Althen*, 418 F.3d at 1279. Proof of a logical sequence of cause and effect is required, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). A petitioner does not meet this obligation by showing only a temporal association between the vaccination and the injury; instead, the petitioner "must explain *how* and *why* the injury occurred." *Pafford*, 2004 WL 1717359, at *4 (emphasis in original). The special master in *Pafford* noted petitioners "must prove [] both that her vaccinations were a substantial factor in causing the illness . . . and that the harm would not have occurred in the absence of the vaccination." 2004 WL 1717359, at *4 (citing *Shyface*, 165 F.3d at 1352). A reputable medical or scientific explanation must support this logical sequence of cause and effect. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (citation omitted). Nevertheless, "[r]equiring epidemiologic studies . . . or general acceptance in the scientific or medical communities . . . impermissibily raises a claimant's burden under the Vaccine Act and hinders the system created by Congress . . . ." *Capizzano*, 440 F.3d at 1325–26. "[C]lose calls regarding causation are resolved in favor of injured claimants." *Althen* 418 F.3d at 1280.

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1281. This "requires preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." *de Bazan v. Sec'y of health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under *Althen* prong one). *Id.*; *Koehn v. Sec'y of Health & Hum. Servs.*, 773 F.3d 1239, 1243 (Fed. Cir. 2014); *Shapiro*, 101 Fed. CL. At 542; *see Pafford*, 451, F.3d at 1358.

Typically, "a petitioner's failure to satisfy the proximate temporal relationship prong is due to the fact that onset was too late after the administration of a vaccine for the vaccine to be the cause." *Id.* However, "cases in which onset is too soon" also fail this prong; "in either case, the temporal relationship is not such that it is medically acceptable to conclude that the vaccination

and the injury are causally linked." *Id.*; *see also Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375, 1381 (Fed. Cir. 2012) ("[If] the illness was present before the vaccine was administered, logically, the vaccine could not have caused the illness.").

A temporal relationship between a vaccine and an injury, standing alone, does not constitute preponderant evidence of vaccine causation. *See, e.g., Veryzer*, 100 Fed. CL. At 356. (explaining that "a temporal relationship alone will not demonstrate the requisite causal link and that [P]etitioner must posit a medical theory causally connecting the vaccine and injury"). The special master cannot infer causation from temporal proximity alone. *See Thibaudeau v. Sec'y of health & Hum. Servs.*, 24 Cl. Ct. 400, 403–04 (1991); *see also Grant*, 956 F.2d at 1148 ("[T]he inoculation is not the cause of every event that occurs within the ten[-]day period . . . [w]ithout more, this proximate temporal relationship will not support a finding of causation." (quoting *Hasler v. United States*, 718 F.2d 202, 205 (6th Cir. 1983))).

## B.  Analysis

Pursuant to the Ruling, there is preponderant evidence that Petitioner suffered from Horner's syndrome and chronic migraines. Accordingly, Petitioner must prove by a preponderance of the evidence that a flu vaccine can cause Horner's syndrome and chronic migraines. Additionally, he must also prove that the flu vaccine actually did cause Petitioner's conditions and did so in a medically appropriate timeframe. Here, I find there is not preponderance evidence that the flu vaccine caused Petitioner's conditions.

Dr. Forman opined the "flu vaccine can provoke an autoimmune response leading to inflammation and dysfunction of sympathetic and trigeminal nerves." Pet'r's Ex. 33 at 3. However, this conclusion lacks evidentiary support: there is no evidence Horner's syndrome (or chronic migraines) has an autoimmune pathogenesis; there is no evidence Petitioner experienced an autoimmune or inflammatory response from the vaccine; and there is no evidence that the 19-day onset is medically appropriate given the lack of an articulated theory.

First, Dr. Forman alluded to molecular mimicry to show that a "scientifically sound theory exists explaining how the [flu] vaccine can trigger an autoimmune cascade resulting in Horner's syndrome." Pet'r's Ex. 34 at 1. To the extent that molecular mimicry is offered as a theory, it must be supported by a sound and reliable medical or scientific explanation." *Knudsen*, 35 F.3d at 548. There must also be some degree of selectivity. *See W.C. v. Sec'y of Health & Hum. Servs.,* 704 F.3d 1352, 1360 (2013) (finding that a petitioner cannot prevail by simply invoking a biological term, or by showing that the mechanism is a valid theory to explain how *other* triggers may have induced *other* diseases and determining that a petitioner must produce additional evidence that the mechanism can cause that vaccine to cause a specific disease); *Caves v. Sec'y of Health & Hum. Servs.,* 100 Fed. Cl. 119, 135 (2011), *aff'd*, 463 F. App'x. 932 (2012); *McKown v. Sec'y of Health & Hum. Servs.,* No. 15-1451, 2019 WL 4072113, at *50 (Fed. Cl. Spec. Mstr. July 15, 2019). Petitioner does not have to provide a specific mechanism, but it must be detailed enough to apply to the administered vaccine and alleged injury in this case. Otherwise, any vaccination, by nature of its purpose to illicit an immune response, could be asserted as the cause of any autoimmune disease that later developed in an individual, and *Althen* prong one "would be rendered meaningless." *See Caves,* 100 Fed. Cl. at 135; *see also McKown,* 2019 WL 4072113, at *50 ("[M]erely chanting the words 'molecular mimicry' in a Vaccine Act case does not render a causation theory scientifically reliable, absent additional evidence specifically tying the mechanism to the injury and/or the vaccine in question."). Petitioner is not limited to any one type

of evidence in support of a molecular mimicry mechanism. A non-exhaustive list of potential evidence includes homology evidence, epidemiology studies, pathogenic antibodies, relevant animal models, or disease etiology specific to the vaccine's live virus counterpart. *See Broekelschen*, 618 F.3d 1339; *Dougherty v. Sec'y of Health & Hum. Servs.*, 141 Fed. Cl. 223 (2018); *Brayboy v. Sec'y of Health & Hum. Servs.,* No. 15-183, 2021 WL 4453146, (Fed. Cl. Spec. Mstr. August 30, 2021). I reiterate, Petitioner is under no obligation to provide any one or more of those types of evidence. This list serves only to illustrate that even in cases of rare and understudied phenomena, petitioners must provide preponderant evidence of causation in support of any identified mechanism. Here, however, Petitioner did not provide any such evidence.

Second, none of the literature filed by Petitioner discusses Horner's syndrome. Thus, there is no evidence in the record to support Dr. Foreman's contention that Horner's syndrome has an autoimmune pathogenesis. In fact, Dorland's Medical Dictionary, in defining Horner's syndrome, states it is "caused by a brainstem lesion on the ipsilateral side that interrupts sympathetic nerve fibers." *Horner Syndrome*, DORLAND'S. This is consistent with Dr. Van Stavern's opinions that Horner's syndrome results "from damage to the oculosympathetic pathway, most commonly due to structural or ischemic injury such as carotid dissection, apical thoracic lesions, vascular pathology, or direct trigeminal involvement." Resp't's Ex. A at 4.

Petitioner did not submit any evidence that links Horner's syndrome or chronic migraines to flu vaccination. Dr. Forman characterized a 1985 case report as an example of trigeminal involvement following vaccination. The Demmler & Heidel article reported on a patient with a pre-existing neurological disease who developed facial dysesthesias two days after a flu vaccination. There is no evidence Petitioner had a pre-exiting neurological disease here. The article does not provide evidence of the pathogenesis of Horner's syndrome or how vaccination can cause Horner's syndrome. In fact, this was the only piece of medical literature Petitioner filed. It was first filed as just the abstract as Exhibit 6; then the full article, in German, was filed as Exhibit 8; then the translated version of the full article was filed as Exhibit 9. As such, there is also no filed literature discussing chronic migraines. Accordingly, I cannot analyze causation in general as to the chronic migraines because Petitioner presented no evidence to this point.

Third, Dr. Forman's theory is contingent on Petitioner undergoing an autoimmune process; however, he did not point to any evidence in the record, nor did I find preponderant evidence in the record, to show that an autoimmune or inflammatory process occurred. Finally, pursuant to the Ruling, the onset of Petitioner's condition was 19 days after vaccination. Petitioner's inability to meet his burden demonstrating how the flu vaccine can cause Horner's syndrome or chronic migraines effectively precludes him from being able to show that his symptoms developed within a medically acceptable timeframe according to said theory. Nonetheless, Petitioner did not present any evidence explaining why 19 days is an appropriate temporal association with vaccination pursuant to his theory or otherwise.

Accordingly, Petitioner has failed to satisfy his burden under *Althen*.

## III.    Conclusion

After a careful review of the record, Petitioner has failed to provide preponderant evidence that his October 4, 2013 flu vaccine caused his Horner's syndrome or chronic migraines.

11

Accordingly, Petitioner's claim is **DENIED**. Absent a timely motion for review, the Clerk is directed to enter judgment dismissing this case for insufficient proof in accordance with Vaccine Rule 11(a). [14]

**IT IS SO ORDERED.**

<u>s/Herbrina D. S. Young</u>
Herbrina D. S. Young
Special Master

---

[14] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.